In re John W. MARTIN and
Rita Martin, Debtors.

**Bankruptcy No. L–89–00674D.**

United States Bankruptcy Court,
N.D. Iowa.

June 25, 1991.

Childers & Vestle, P.C., Cedar Rapids, Iowa, for debtor.

Kristin Tolvstad–Davis, Asst. U.S. Atty., U.S. Atty's Office, Cedar Rapids, Iowa, for FmHA.

Eric Lam, Moyer & Bergman, Cedar Rapids, Iowa, for Production Credit Ass'n.

## RULING RE: PCA'S MOTION FOR SUMMARY JUDGMENT

MICHAEL J. MELLOY, Chief Judge.

This matter comes before the Court on a motion for summary judgment filed by Production Credit Association of the Midlands ("PCA"). PCA seeks summary judgment on a motion filed by Farmers Home Administration ("FmHA") which seeks to disgorge proceeds from life insurance proceeds which the co-debtor, Rita Martin, paid to PCA. FmHA believes the life insurance proceeds should be returned to the estate and distributed as disposable income to unsecured creditors since there was no provision for the payment of the proceeds to PCA in the debtors' confirmed Chapter 12 plan of reorganization. For a variety of reasons, PCA believes that it is entitled to retain all of the proceeds that it received from Rita Martin. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following decision denies PCA's motion for summary judgment.

### Background

The following undisputed facts are taken from a stipulation the parties have entered into and are supplemented by the findings of this Court based upon a review of the court file.

1. On March 24, 1987, the debtors, John and Rita Martin, ("debtors" or "Martins") filed a voluntary Chapter 12 bankruptcy petition.

2. In the original schedules and amended schedules accompanying the Chapter 12 filing, the debtors listed both PCA and FmHA as creditors. The debtors' schedules treated PCA as both a secured and unsecured creditor. The schedules listed PCA's security as consisting of livestock, crops, machinery, some land, crop proceed

checks, and accounts. The debtors did not mention or refer to a Illinois Mutual Term Life Insurance Policy, which was being held by the PCA as additional security for the PCA debt.

3. The PCA filed two proofs of claim on April 13, 1987 (Claim Numbers 9 and 10). Claim No. 9 was filed as a secured claim in the amount of $494,511.62. It claimed as security for the PCA debt, debtor's real estate, farm machinery and equipment, livestock and crops. No reference was made in the proof of claim to the Illinois Mutual insurance policy. Claim No. 10 was filed as a general unsecured claim and requested that to the extent the value of the collateral securing the PCA debt was determined to be less than the total indebtedness that the under-secured portion of the debt be allowed as an unsecured claim.

4. The debtors' original Chapter 12 Plan was filed on March 24, 1987. A fairly detailed recitation of the events leading up to confirmation of debtors' plan and the claims allowance process is necessary for adjudication of the dispute before the Court. A review of the court file shows the following relevant events.

a. The plan as originally filed by the debtors proposed to treat the PCA claim as secured in the amount of $388,079, with the balance of the claim unsecured. The plan recited that the PCA had a "barnyard blanket" security interest in debtors' personal property as well as mortgages on various parcels of debtors' real estate. The plan made no reference to the life insurance policy.

b. The plan was noticed to all creditors and a confirmation hearing was set. The PCA filed an objection to confirmation and set forth a number of objections. One of the objections stated that the PCA collateral was under-valued and that the allowed secured claim of the PCA should be increased. None of the PCA's objections, however, ever mentioned or complained of the omission of the life insurance policy on the list of PCA's security.

c. Both the debtors and the PCA (as well as other creditors) appeared at the scheduled confirmation hearing. At the hearing the parties advised the court that all valuation disputes had been resolved and that all objections to confirmation had been settled through negotiation. The debtors were directed to file an amended plan that incorporated the settlements and if there were no further objections the amended plan would be confirmed.

d. Amendments to the plan were filed by the debtors and the PCA withdrew its objection to confirmation. The amended plan did not change the amount of the PCA allowed secured claim, which was set at $388,079, but the amended plan did modify how the PCA secured claim was to be paid. The plan provided that PCA would retain its lien upon machinery, livestock, and the 1987 crop as well as a second mortgage on Parcels 3 and 3a. The plan also specifically provided for the avoidance of PCA's second lien position in parcels 1, 2, and 4 of the debtors' land; the agreed plan indicated that there was no equity in those three parcels of real estate to stand as security for the PCA debt. Again, there was no mention of the life insurance policy in the plan amendments and the debtors have never taken any action or made any provision in their plan to avoid PCA's lien in the life insurance policy or the proceeds of the policy.

e. The amended plan was confirmed on June 4, 1987. The order confirming the plan did not mention the life insurance policy or its assignment to PCA.

5. The Chapter 12 trustee's original report on claims to be paid under the confirmed plan reported that PCA had a $106,643.62 unsecured claim and recommended that the Court allow the PCA an unsecured claim in that amount. The trustee's claims report, however, made no mention of the PCA secured claim. PCA filed a prompt objection to the trustee's report on claims asserting a secured claim of $388,079 based on both PCA's proof of claim and the treatment provided under the debtors' confirmed Chapter 12 plan. The trustee filed an amended report on claims and listed PCA's total claim as $494,511.62, and recommended the Court allow $388,079 as secured and $106,432.62 as unsecured. On

December 23, 1987, PCA withdrew its objection to the trustee's report on claims, citing satisfaction with the trustee's amended report.

6. On February 8, 1989, the Court entered an order approving the trustee's report on claims.

7. At the time the debtors filed their Chapter 12 petition, Rita Martin was the owner of the Illinois Mutual Life Insurance policy, insuring the life of John W. Martin. On or about February 10, 1984, Rita Martin assigned the life insurance policy to PCA as additional security for the PCA loan.

8. On May 11, 1988, John W. Martin died. Mrs. Martin received in excess of $250,000 from the life insurance policy as a result of Mr. Martin's death.

9. In their individual federal and state tax returns for calendar year ending 1989, the proceeds from the life insurance policy were not reported by Rita Martin or John W. Martin as income. Likewise, the acquisition of the proceeds was never reported to this Court nor any creditors of the bankruptcy estate, except, the PCA.

10. PCA asserted an entitlement to these life insurance proceeds pursuant to the assignment of the policy it received from Rita Martin in 1984. The PCA and the debtor, Rita Martin, eventually became involved in an adversary proceeding to determine who was properly entitled to the proceeds. The proceeds from the life insurance policy insuring John W. Martin's life were placed in an interest bearing escrow account.

11. On or about February 7, 1989, pursuant to an agreement between PCA and debtors to settle the adversary, PCA was paid approximately $154,432.19 which was applied to PCA's allowed secured claim. On or about February 27, 1990, PCA was paid $76,122.37 which also was applied to its allowed secured claim. On the same date, PCA also was paid, pursuant to the adversary settlement, $32,754.38 which was applied to PCA's allowed unsecured claim.

All three of these payments were from the life insurance proceeds.

The settlement between Mrs. Martin and the PCA was not noticed to creditors and was not submitted to the Court for its approval. Rather, the parties agreed to the settlement and filed a joint dismissal of the adversary complaint.

12. For purposes of plan distribution, FmHA holds an allowed unsecured claim in the approximate amount of $128,807.72. Federal Land Bank of Omaha ("FLB") and PCA hold the only other allowed unsecured claims in this case.

Discussion and Conclusions of Law

On March 13, 1990, FmHA filed a motion to require PCA to disgorge[1] proceeds it received pursuant to the adversary settlement and for an order to distribute those life insurance proceeds to unsecured claimants. FmHA believes that PCA is bound to the terms of the confirmed plan by virtue of § 1227(a)[2] and that by virtue of § 1227(b) & (c), the life insurance proceeds revest in the debtor, Rita Martin, free and clear of all liens. FmHA argues that by revesting free and clear of all liens, these proceeds generate income for Rita Martin which would be subject to the disposable income analysis under § 1225(b) and eventually distributed as "disposable income" to unsecured creditors.

In response to that motion and those arguments, PCA contends that it is not bound by § 1227(a) and pursuant to § 506(d) its lien survives confirmation of the plan and, therefore, the proceeds do not revest in the debtor, Rita Martin free and clear of PCA's lien. Moreover, PCA believes that the proceeds cannot be characterized as income and, therefore, cannot be subject to the disposable income distribution requirements. Furthermore, PCA does not even believe that the life insurance proceeds constitute property of the debtors' estate. The debtor supports and has adopted all of the PCA arguments.

1. A motion to disgorge essentially assumes that a party attained an "ill gotten gain" which should be returned to the appropriate place.

2. All statutory references are to Title 11, United States Code, the Bankruptcy Reform Act of 1978, as amended, unless otherwise indicated.

PCA filed a motion for summary judgment in connection with FmHA's motion to disgorge the life insurance proceeds. In a later amended motion for summary judgment, the PCA stated that the parties to that proceeding request that the Court determine whether § 1227 binds the PCA, the effect of the interplay between § 506(d) and § 1227 on the settlement between the PCA and the debtors, whether the life insurance proceeds is property of the estate, and whether these proceeds can be characterized as income subject to the disposable income requirements of § 1225(b).

After PCA filed its motion for summary judgment, FmHA filed a motion seeking the authority to avoid PCA's lien in the life insurance proceeds pursuant to § 506(d). At the PCA's request, this Court continued the FmHA's motion pending resolution of the summary judgment motion.

The Court has held several hearings on this matter and has discussed the possibility of settlement on several occasions. As the result of a hearing held on March 15, 1991, the Court entered an order on March 20, 1991, indicating that the parties were to advise the Court within 20 days as to whether settlement of the disputes was possible. If no settlement could be achieved then a decision would be issued. The Court has not been advised that settlement is possible. While the debtor has since submitted a proposed modification to the treatment of the PCA's claim under the confirmed plan, there has been no indication that this modification in any way resolves or satisfies the questions raised in this summary judgment proceeding. Hence, this Court will proceed to issue its ruling on the issues raised in PCA's motion for summary judgment and FmHA's response.

To prevail on a motion for summary judgment the moving party must satisfy Bankruptcy Rule 7056 which incorporates Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) states that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law." This is a two-step process where the moving party must demonstrate that 1) no genuine issues of material fact exist, and 2) the law entitles the moving party to relief as a matter of law on these undisputed facts.

While the parties in this proceeding agree that there are no disputed issues of material fact, the FmHA has filed no formal response to PCA's motion for summary judgment, nor has FmHA filed a cross-motion for summary judgment. However, the FmHA has extensively briefed the issues before the Court. All parties essentially have treated FmHA's participation in this matter as a joinder in PCA's motion for summary judgment and as a cross motion for summary judgment. PCA's last amended motion specifically states that "the *parties* respectfully seek summary judgment from this Court" on the issues raised. Hence, the Court will treat the lack of a formal response by the FmHA only as an admission that there are no genuine issues of material fact. This summary judgment motion will be decided on whether either the PCA or FmHA is entitled to relief as a matter of law on the issues raised in PCA's summary judgment motion and FmHA's response.

As a preliminary matter, this Court must note that many of the issues presented here have not been interpreted under the Chapter 12 provisions in question. Hence, this Court will turn to Chapter 13 cases for guidance. As a number of courts have observed, "[i]n interpreting the provisions of Chapter 12, courts have often turned to Chapter 13 for guidance because Chapter 12 was closely modeled after Chapter 13...." *In re Nielsen*, 86 B.R. 177, 178 (Bankr.E.D.Mo.1988) (citing *In re Kjerulf*, 82 B.R. 123 (Bankr.D.Ore.1987); *In re Rockefeller*, 100 B.R. 874, 875 n. 2 (Bankr. E.D.Mich.1989) (quoting same language from *Nielsen*); *see also In re Schuldies*, 122 B.R. 100, 102 (D.S.D.1990) (observing parenthetically the similarity between Chapter 12 and Chapter 13 for the purposes of analogy); *In re Shannon*, 100 B.R. 913, 934 n. 52 (S.D.Ohio 1989) (noting

that Congress "intended Chapter 13 cases to be precedents in similar Chapter 12 situations") (quoting *In re Hardzog*, 74 B.R. 701, 702 (Bankr.W.D.Okla.1987)); *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 126 (Bankr.D.Mont.1987) ("Chapter 13 case precedents thus provide a valuable tool for interpretation of Chapter 12 provisions because of the similar or identical language of each chapter."). In this case, all relevant Chapter 12 provisions have similar, if not identical counterparts, in Chapter 13. Hence, the Court will look to Chapter 13 cases in the absence of controlling Chapter 12 precedent.

### A. *The Binding Effect of § 1227*

█ FmHA argues that PCA should disgorge the life insurance proceeds it received from the debtor because PCA is bound under § 1227 to the treatment it receives under the debtors' confirmed Chapter 12 plan. Section 1227 states:

(a) Except as provided in section 1228(a) of this title, the provisions of a confirmed plan bind the debtor, each creditor, each equity security holder, and each general partner in the debtor, whether or not the claim of such creditor, such equity security holder or such general partner in the debtor is provided for by the plan, and whether or not such creditor, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in section 1228(a) of this title and except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

FmHA contends that PCA is bound under § 1227(a) to the treatment provided for PCA's claim under the debtors' confirmed plan. Further, FmHA asserts that PCA's lien in the insurance proceeds is extin-guished because under § 1227(b) & (c) all property revests in the Chapter 12 debtor free and clear of liens once the plan has been confirmed.

█ The arguments made by FmHA find support in Chapter 12 and Chapter 13 case law. First, under § 1227(a) or § 1327(a) a confirmed plan provides a binding, res judicata effect "unless and until it is modified" under § 1229 or § 1329. *In re Jock*, 95 B.R. 75, 77 (Bankr.M.D.Tenn.1989) (Chapter 13 case); *In re Perkins*, 111 B.R. 671, 672 (Bankr.M.D.Tenn.1990) (Chapter 13 case quoting *Jock*); *In re Wickersheim*, 107 B.R. 177, 181 (Bankr.E.D.Wis.1989) (Chapter 12 case); *In re Williams*, 108 B.R. 119, 122 (Bankr.N.D.Miss.1989) (Chapter 13 case quoting *Jock*); *In re Cooper*, 94 B.R. 550, 552 (Bankr.S.D.Ill.1989) (Chapter 12 case noting "absent a modification under § 1229, the provisions of a confirmed Chapter 12 plan are binding on both the debtor and his creditors."); *In re Grogg Farms, Inc.*, 91 B.R. 482, 485 (Bankr. N.D.Ind.1988) (Chapter 12 case). Second, some courts have found that the binding effect can reduce the amount of a secured creditor's lien not otherwise specifically preserved under the confirmed plan. *In re Hebert*, 61 B.R. 44, 47 (Bankr.W.D.La. 1986); *In re Tucker*, 35 B.R. 35, 36–37, 37 n. 3 (Bankr.M.D.Tenn.1983) (dealing with insurance proceeds); *In re Alexander*, 11 B.R. 313, 315 (Bankr.S.D.Ohio 1981) (also dealing with insurance proceeds).

PCA responds to the FmHA arguments by asserting that many courts have provided an important and relevant limitation on the binding effect of § 1227 and § 1327. A secured creditor's lien in collateral can not be avoided by a plan confirmation, notwithstanding § 1227(a), unless the lien is specifically avoided by some affirmative act of the debtor or a party in interest. *In re Simmons*, 765 F.2d 547, 555–59 (5th Cir. 1985) (Chapter 13 case); *In re Thomas*, 883 F.2d 991, 996–99 (11th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3245, 111 L.Ed.2d 756 (Chapter 13 case); *see also In re Tarnow*, 749 F.2d 464, 465 (7th Cir.1984) (Chapter 11 case); *Estate of Lellock v. Prudential Insurance Company*, 811 F.2d 186, 189 (3rd Cir.1987) (Chapter 7 case).

PCA primarily relies on the reasoning provided in the *Simmons* and *Tarnow* cases which note that in order to avoid the lien, the debtor must comply with § 506(d) of the Bankruptcy Code. In particular, courts following this approach have held that the debtor must file a motion or complaint to have the lien avoided under § 506(d) or make a specific provision in their plan avoiding the lien under § 506(d). *In re Glow*, 111 B.R. 209, 221 (Bankr. N.D.Ind.1990) (stating that "[a] lien survives a bankruptcy proceeding where the debtor fails to take any steps to avoid the lien or to provide for the voidance of the lien in the chapter 13 plan or by an independent adversary proceeding attacking the lien.") (citations omitted). Here, PCA claims that nothing has been done to avoid the lien of PCA in the life insurance proceeds and, therefore, the lien continues to be valid and enforceable in full against the proceeds.

The above cases supporting the different sides of the argument present somewhat of an irreconcilable split of authority on the lien avoidance question. Most Circuit Courts, and the greater weight of authority, deciding this issue, however, have adopted the § 506(d) analysis. *See, e.g., Matter of Pence*, 905 F.2d 1107, 1109 (7th Cir.1990) (Chapter 13 case); *Thomas*, 883 F.2d at 996–99; *Simmons*, 765 F.2d 547; *In re Glow*, 111 B.R. at 221; *In re Junes*, 99 B.R. 978, 980–81 (9th Cir. BAP 1989); *In re Hydorn*, 94 B.R. 608, 613–15 (Bankr. W.D.Mo.1988) (Chapter 13).

Section 506(d) provides that:

To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

The *Collier* treatise points out that the portion of a lien exceeding the allowed secured claim will be avoided under § 506(d) except under the "explicitly enumerated circumstances" in sections 506(d)(1) & (2). *See* 3 *Collier on Bankruptcy* ¶ 506.07, at 506–68 (15th ed. 1991). The Court notes that none of those circumstances is present here. PCA's claim was not disallowed under sections 502(b)(5) or 502(e), so § 506(d)(1) does not apply. Likewise, PCA filed a proof of claim and its claim was allowed, so § 506(d)(2) does not present any bar to lien avoidance. The case law is equally clear, however, "that unless action is taken to avoid a lien, it passes through a bankruptcy proceeding" unaffected. *Pence*, 905 F.2d at 1109; *see also, In re Glow*, 111 B.R. at 221. Here, there is no dispute that at this point in the proceeding, PCA's lien in the insurance proceeds has not been avoided under § 506(d).

The case before this Court, however, is unlike any of the above § 506(d) cases which hold that the lien was not avoided in a Chapter 13 proceeding where no affirmative lien avoidance action was taken. Most of these cases deal with one of two situations. One line of cases is like *Tarnow* and *Lellock* in which the secured creditor did not file a timely proof of claim and, therefore, did not participate in the Chapter 13 plan. The courts in those cases held that the creditor could still look to its collateral because there was no action taken by either the creditor or the debtor to avoid the lien or to deal with the collateral in the confirmed plan. The other line of cases is represented by the *Simmons* case where the secured creditor filed a timely secured proof of claim but the debtor proposed to treat the claim as unsecured in the plan. The court held that the lien survived confirmation of the plan even though the creditor did not object to its treatment as an unsecured creditor because the debtor had taken no affirmative action to avoid the lien under § 506(d).

This case is unlike those cases in that PCA filed a timely proof of claim and has fully participated in the claims adjudication, plan, and confirmation processes. Moreover, there was a claims adjudication process throughout the filing of a claims report by the trustee, notice of the claims report to all creditors, including PCA, a

PCA objection to its claim treatment in the report, an amendment to the report, and order allowing the PCA claim in the amounts set forth in the amended claims report. Courts such as *Simmons* indicated that the outcome of their case would have been different had the party in interest requested the court to determine the allowed secured claim as part of the plan confirmation process. 765 F.2d at 559. *See also Tarnow,* 749 F.2d at 466; *Hydorn,* 94 B.R. at 615. This case is further distinguishable by the fact that PCA has yet to file a proof of claim in this Court asserting a lien in the life insurance proceeds.

This Court has not located any cases which are directly on point with the present case. The only cases which have dealt with comparable situations where a secured creditor files a proof of claim, the allowed secured claim is less than the full amount of claim asserted, a portion of the creditor's collateral was omitted from the allowed secured claim, and nothing has been done to avoid the lien, have approached the matter with differing analyses. *Compare In re Duplechain,* 111 B.R. 576, 579–81 (Bankr.W.D.La.1990) *with In re Alexander,* 11 B.R. 313, 315 (Bankr.S.D.Ohio 1981).

The Court believes that *In re Alexander,* 11 B.R. 313 (Bankr.S.D.Ohio 1981), a case substantially similar to the one before this Court, provides the more persuasive analysis here. In *Alexander* a secured creditor was owed more than $2,000 and had a security interest in the debtor's household goods and any insurance proceeds resulting from the damage or destruction of those goods. The household goods were damaged prior to debtor's Chapter 13 petition but the insurance proceeds were paid after the petition was filed. The secured creditor filed a claim against the bankruptcy estate but also collected $1132.20 of the insurance proceeds from the household goods outside of the bankruptcy proceeding. The debtor sought to have these funds returned to the estate because the secured creditor's allowed secured claim in the bankruptcy totalled only $500, the value of the household furniture.

In ruling for the debtor the *Alexander* court observed that the:

> ... [secured creditor's] claim was valued by the Court pursuant to 11 U.S.C. § 506(a). At that time [the secured creditor] did not assert its security in the insurance proceeds as it was required to do in a timely fashion under ... the Rules of Bankruptcy Procedure. Instead, it accepted the $500.00 valuation set by the Court (representing the value of the remaining household goods ...). By not seeking valuation of its interest in the insurance proceeds and by not requesting that the Court's valuation include those proceeds, [the] allowed secured claim was limited to $500.00. [The secured creditor] has not requested any reconsideration of this claim allowance. See 11 U.S.C. § 502(j). This $500.00 is being paid by the Chapter 13 trustee pursuant to the Court's Order Confirming Chapter 13 Plan, and the remainder of [the] claim is included in the proposed 100% dividend to all holders of allowed unsecured claims being paid under the plan. Because the Order Confirming Chapter 13 Plan, which sets out the terms of the plan and the valuation of the allowed secured claims, is res judicata on all issues which could have been raised but were not asserted, [the secured creditor's] allowed secured claim is limited to $500.00.... Thus, [the secured creditor's] lien was properly documented and established on the furniture and such furniture, while now property of the debtors under § 1327, is subject to the lien of [the secured creditor]. The substituted collateral, the insurance proceeds, is not so encumbered because of the failure of [the secured creditor] to document in a timely fashion its lien rights. Such proceeds are thus property of the debtors under § 1327 without any lien in favor of [the secured creditor].

11 B.R. at 315 (citations omitted unless otherwise noted). This discussion provided in the *Alexander* case applies equally in the matter presently before this Court as PCA failed to document its lien rights as part of its collateral.

Here, the PCA had ample opportunity to assert that lien in the insurance proceeds as part of its secured claim. PCA had full access to and participation in the claims process. PCA filed a proof of claim which asserted a secured claim which was secured by a lien in debtors' real property and farming operation. PCA's proof of claim made no mention of or reference to its interest in the life insurance proceeds.

PCA made objections to the treatment of the PCA claim in the debtor's original plan and the debtors amended their plan to comply with PCA's requests. PCA's objections never addressed the omission of its interest in the life insurance policy or its proceeds. PCA also objected when the Chapter 12 trustee's report on claims stated that PCA's only claim was a $106,432.62 unsecured claim. PCA's objection again addressed only the failure of the trustee's report to mention its $388,079 secured claim—which was based on PCA's lien against the debtors' land and agricultural personal property. PCA withdrew its objection and expressed satisfaction with the trustee's amended report on claims which provided PCA with a $494,511.62 claim, of which $388,079 is treated as secured. The Court subsequently entered an order approving the trustee's report on claims.

The following observations of the *Hydorn* court summarize the effect of the claims process and apply equally in this case:

> at the Chapter 13 Trustee's request, [the secured creditor's] claim was ordered allowed as secured by this Court.... The determination of a claim's allowability is a judicial act that is within the exclusive province of the bankruptcy judge. The status of the [secured creditor's] claim under the Code was thereby established for the remainder of the bankruptcy proceeding.

94 B.R. at 612–13 (citations omitted). Hence, for the remainder of the bankruptcy proceeding here, PCA has a $388,079

allowed secured claim or "right to payment." [3] *See* § 101(5) (defining claim as "right to payment"). In this entire claims process neither the debtors nor PCA ever mentioned the life insurance policy or PCA's entitlement to the proceeds of the policy. Most importantly, PCA never asserted a claim against those proceeds. Even when the proceeds became payable due to the death of John Martin, the PCA failed to assert a claim against the proceeds through the bankruptcy process. The fact that PCA asserted an interest in the proceeds to the debtor does not suffice as asserting a claim in the bankruptcy proceeding. *See* §§ 501 & 502.

Based on the similarities between this case and the *Alexander* case, the Court will follow the analysis provided in *Alexander* to resolve this dispute. This Court finds that the PCA can not enforce whatever lien rights it might have in the insurance proceeds since the insurance proceeds have never been included in PCA's allowed secured claim. As in *Alexander*, the PCA has failed to assert the lien properly as part of its allowed secured claim in the bankruptcy proceeding. The net effect is that the creditor has lost its right to have that lien treated as part of its secured claim. The only remedy for the creditor in that situation, as the *Alexander* court pointed out, is to ask the court to reconsider the allowed secured claim under § 502(j) and include the lien as part of the reconsidered allowed secured claim.

As the Eleventh Circuit recently observed, "[s]ection 502(j) and Bankruptcy Rule 3008 grant the bankruptcy court the power to reconsider for cause secured claims that previously have been allowed." *In re International Yacht and Tennis,* 922 F.2d 659, 662 (11th Cir.1991). The relevant part of § 502(j) for this proceeding states:

> A claim that has been allowed or disallowed may be reconsidered for cause. A

---

**3.** This secured status was based on PCA's liens on the farming operation and the extent to which the debtors' land values supported PCA's lien on that land. To the extent that the debtors' land did not have value to support the liens,

PCA's claim was treated as unsecured and the remaining liens on the land were avoided under the plan pursuant to § 506(d) to the extent they were unsecured.

reconsidered claim may be allowed or disallowed according to the equities of the case.

Rule 3008 provides the procedure for claim reconsideration under § 502(j). Rule 3008 reads:

A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. The court after a hearing on notice shall enter an appropriate order.

The Advisory Committee Notes accompanying Rule 3008 further state that:

After reconsideration, the court may allow or disallow the claim, *increase* or decrease *the amount of a prior allowance* ... or enter any other appropriate order.

(emphasis added). As the above authority points out, the accepted way for PCA to modify a previously allowed secured claim is through the process of claim reconsideration under Rule 3008 and 502(j).

■ The Court believes that the agreement between PCA and the debtor to pay the life insurance proceeds to PCA is an impermissible attempt to increase the amount of PCA's previously allowed secured claim without following the procedures outlined in the Bankruptcy Code and Rules. The agreement essentially acknowledges PCA's right to payment in full on $32,754.38 of its unsecured claim, in effect raising that portion of the unsecured claim to secured status. Under the plan PCA already had a $388,079 allowed secured claim that was being paid in full. The agreement added a $32,754.38 payment from the insurance proceeds to that claim without submitting the claim to allowance or approval procedures.

To date, PCA has not made any request for reconsideration of its previously allowed $388,079 secured claim. Again, as the *Hydorn* court pointed out, that previously allowed secured claim binds the creditor in the bankruptcy. *See* 94 B.R. at 613. Hence, the Court will consider $388,079 to be PCA's full right to payment as a secured claimant in this proceeding, unless or until PCA demonstrates that it can prevail on a motion to reconsider its claim under § 502(j) and the Court increases the allowed amount of the secured claim.

■ At this point in the proceeding, PCA has not filed a motion to reconsider its claim. PCA's allowed secured claim and allowed unsecured claim are both being provided for under the debtors' confirmed plan of reorganization. As noted previously, a confirmed Chapter 12 plan is binding under § 1227(a) unless or until the plan is modified. *In re Jock*, 95 B.R. at 77 (Chapter 13 case); *In re Perkins*, 111 B.R. at 672 (Chapter 13 case); *In re Wickersheim*, 107 B.R. at 181 (Chapter 12 case); *In re Williams*, 108 B.R. at 122 (Chapter 13); *In re Cooper*, 94 B.R. at 552 (Chapter 12 case noting "absent a modification under § 1229, the provisions of a confirmed Chapter 12 plan are binding on both the debtor and his creditors."); *In re Grogg Farms, Inc.*, 91 B.R. at 485 (Chapter 12 case). Here, any modification also would need to include a provision seeking reconsideration of the PCA claim to include its entitlement to the proceeds. There has been no modification filed which comports with the agreement PCA and the debtors entered into on the life insurance proceeds. Therefore, this Court concludes that PCA is bound under § 1227(a) to the treatment provided in the confirmed plan of reorganization.

■ The Court also concludes that the life insurance proceeds are property of the estate that revest in the debtor under § 1227(b) & (c) free and clear of PCA's lien. This Court is aware that most courts subscribe to the analysis of the leading case, *In re Honaker*, 4 B.R. 415 (Bankr. E.D.Mich.1980), when addressing the effect of § 1227(b) & (c) on liens. *See, e.g., Thomas*, 883 F.2d at 998; *Simmons*, 765 F.2d at 555–59; *Hydorn*, 94 B.R. at 614–15 (all relying on *Honaker*). The *Honaker* analysis operates from the perspective that § 1327 (identical to § 1227) relates only to property of the debtor's estate. *Honaker* found that a debtor could not gain a better position on property than the estate had when the bankruptcy started. Hence, unless a lien was specifically avoided, *Honaker* found that the debtor can not, solely by

virtue of § 1327(b) & (c), reclaim the property free of that lien.

The *Honaker* case, however, was dealing with a situation where the debtor was attempting to avoid a lien not specifically extinguished under § 506(d) or by any other means. Thus, the creditor in *Honaker* had an otherwise recognizable entitlement to enforce the lien. This Court finds that the *Honaker* analysis is inapplicable here since the Court has found that PCA failed to assert a recognizable secured claim against the proceeds. Hence, PCA waived its lien on the proceeds and the debtor has an unencumbered entitlement to all of the proceeds.

It also should be noted that *Honaker* built an important part of its reasoning on the observation that a lien is not a "claim or interest" under the Bankruptcy Code and, therefore, was not meant to be avoided under the language of § 1227(b) & (c). The recent Supreme Court case, *Johnson v. Home State Bank*, —— U.S. ——, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) calls that reasoning into question. The Supreme Court held that the definition of "claim" under the Code encompasses "liens". Hence, in light of the *Johnson* case, the Court believes that under the "plain meaning" of § 1227(b) & (c) the property should be returned to the debtors' estate free and clear of liens.

■ Finally, PCA contends that a finding that the PCA does not maintain a valid lien in the proceeds would encourage debtors to conceal assets from the bankruptcy court in the initial stages of the proceeding in hopes that the creditors would fail to raise the problem and the creditor's lien would be "washed out" of the property. The Court believes this argument is without merit. First, the debtor faces possible bankruptcy fraud or perjury charges for intentionally concealing property that must be listed. Second, there is no evidence in this case that the debtor deliberately concealed the existence of the policy. Evidently, both the debtor and PCA, which had the policy assignment in its loan file, failed to comprehend the fact that the policy may have value to the debtor, PCA, and creditors at some point during the administration of this case. Moreover, if the debtor concealed assets without the secured creditor's knowledge and the secured creditor fails to assert a claim on that basis, this may constitute "cause" for reconsidering the claim under § 502(j) at the time the creditor discovers the discrepancy.

By way of conclusion on this issue, the Court finds that PCA is not entitled as a matter of law, to escape the motion of FmHA to disgorge the life insurance proceeds, by asserting that it is not bound by debtors' confirmed Chapter 12 plan. PCA is bound by the plan unless and until the debtor or PCA can achieve a reconsideration of PCA's claim and modify the plan in accordance with that reconsidered claim.[4] Until such time as those procedures can be accomplished, if ever, the plan binds the PCA and the insurance proceeds shall revest in the debtor pursuant to § 1227(b) & (c) free and clear of any claim or interest, including PCA's lien.

## B. *Life Insurance Proceeds as Property of Debtors' Estate*

■ PCA contends that even if the Plan binds, PCA does not need to turn over the proceeds because they are not property of the estate. PCA asserts that the assignment of the proceeds was unconditional and, therefore, the estate did not acquire any real or contingent interest in the proceeds that would make them subject to the property of the estate provisions of Chapter 12. PCA apparently believes that if the proceeds are not considered property of the estate, then the other creditors of the estate, including the FmHA, cannot require the proceeds to be disgorged or distributed.

The Court notes that the holding on the binding effect of the plan and in particular, that PCA has asserted no claim against the proceeds, really disposes of PCA's argument that the estate has no interest in the proceeds because the debtors assigned the

---

**4.** The Court explicitly and unequivocally notes that it does not intend anything in this text to

indicate how it would view a § 502(j) motion for reconsideration of PCA's claim.

proceeds to PCA. Under the Court's holding, PCA does not currently have an interest to assert against the proceeds. Even if it is possible for PCA to attain reconsideration of its claim, resolving this issue, at a minimum, is premature.

Nonetheless, even assuming, *arguendo*, that PCA's lien has not already been waived or extinguished in this proceeding, the Court must find that the proceeds are property of the estate. In a Chapter 12 proceeding § 1207 governs what constitutes property of the debtor's estate. That section provides:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed or converted to a case under chapter 7 of this title, whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first.

(b) Except as provided in section 1204, a confirmed plan, or an order confirming a plan, the debtor shall remain in possession of all property of the estate.

For the purposes of this case, § 1207 essentially incorporates the definition of property of the estate under § 541 and adds to that any property acquired post-petition that also would qualify as property of the estate under § 541.

PCA argues that the life insurance proceeds cannot be considered as property of the estate because the debtors never acquired an interest in those proceeds when John Martin died because Rita Martin previously had assigned the proceeds to PCA as security for a loan. PCA relies extensively on the holding and reasoning of *In re Goldberg,* 98 B.R. 353 (Bankr.N.D.Ill. 1989) in making this argument. In *Goldberg,* a Chapter 7 debtor conveyed the right to his life insurance proceeds to his probate estate. The debtor died during his bankruptcy and the Chapter 7 trustee sought to recover the proceeds for the bankruptcy estate. The court in *Goldberg* found that the bankruptcy estate never "acquired" any interest in the proceeds and, therefore, the proceeds of the life insurance could not properly be considered property of the debtor's estate. 98 B.R. at 358–59.

The PCA believes that the analysis in this case should be similar, if not identical, to the *Goldberg* case. According to the PCA, the assignment was unconditional and left nothing for the estate to acquire on the death of John Martin. PCA further pointed out that in *Lellock,* the Third Circuit ruled that a valid, unconditional assignment of life insurance proceeds to a creditor left the estate with no interest, real or contingent, to become property of the estate. 811 F.2d at 189–90. PCA asserts that this reasoning should control in this case as well.

FmHA counters these arguments by asserting that the Eighth Circuit decision in *In re Titan Energy, Inc.,* 837 F.2d 325 (8th Cir.1988) governs this property of the estate question. In *Titan Energy* the question presented was whether liability insurance policies and their proceeds were property of the debtor's estate when the debtor had no real interest in them other than the fact that the payments from these policies would reduce the claims against the debtor's estate. The Eighth Circuit found that those policies and their proceeds were property of the debtor's estate. *Titan Energy,* 837 F.2d at 329. FmHA notes that the *Titan Energy* court based a large part of its reasoning on the fact that the estate has more value when those proceeds are included in the estate. FmHA argues that the Martin estate is more valuable if the insurance proceeds are included.

The Court believes that reading the authority of PCA and FmHA together provides the best indication of whether the life insurance proceeds are property of the estate. The Court believes that the *Titan Energy* decision qualifies the PCA authority and that together these cases stand for

the principle that the debtor's bankruptcy estate does not obtain any property unless the debtor has or acquires a real or contingent interest in that property which will add value to the estate (i.e. a debtor must acquire a real or contingent interest in the property before it can make the estate more valuable than without it).

Here, Rita Martin's assignment of the insurance proceeds to PCA contained the following relevant language:

> .This assignment is intended to secure such indebtedness of the insured and/or owner of the assignee as may exist at the time of settlement under this policy and this assignment is expressly limited to such of the proceeds under the policy as may be necessary to liquidate said indebtedness, all remaining rights under said policy as to its proceeds being unaffected hereby. Upon payment of the obligation hereby secured, this assignment shall become null and void....

As the PCA pointed out in its brief supporting its motion for summary judgment, the assignment language limits the debtors' rights to the proceeds "to the extent to which the policy proceeds are not necessary to pay the indebtedness due PCA." Stated another way, the debtors also retain rights to the extent the proceeds are not needed to satisfy PCA's claim.

Even if life insurance proceeds constitute additional collateral for PCA's allowed secured claim, the proceeds must nonetheless be considered property of the debtors' estate because they would still add at least some potential value to the estate.[5] Unlike

the *Goldberg* and the *Lellock* cases, Rita Martin's assignment of the proceeds to PCA in this case is conditional. The Martins continue to have a contingent entitlement to any amount of proceeds, no matter how small, not needed to take care of PCA's claim. As FmHA points out, this case more akin to *In re Hawkeye Chemical Co.,* 71 B.R. 315, 321 (Bankr.S.D.Iowa 1987) where Judge Jackwig observed that insurance proceeds became property of the debtors' estate when the assignment of the proceeds as security for a debt was not absolute. The Court believes that the potential interest the Martins retain in the proceeds requires the funds to become part of the bankruptcy estate because contingent interests become property of a debtor's estate.[6] *See, e.g., In re Neuton,* 922 F.2d 1379, 1382–83 (9th Cir.1990); *U.S. v. Cardall,* 885 F.2d 656, 678 (10th Cir.1989); *In re Bialac,* 712 F.2d 426, 431 (9th Cir. 1983).

Here, the Court concludes that the entire fund is property of the estate and administered under the auspices of the Bankruptcy Code. As the Court previously has pointed out, the PCA is bound by the terms of the debtors' confirmed Chapter 12 plan which does not provide for the treatment of the life insurance proceeds. If the PCA feels that it has a valid interest in the proceeds, they may assert that interest via the methods laid out in Part A of this decision. Then, the Court and the other creditors can determine the extent of PCA's remaining lien, if any, in the proceeds and determine what amount of proceeds, if any, remains for distribution to other creditors.

---

5. The same result is true if prior to confirmation, the proceeds were included in PCA's original allowed secured claim. PCA would have been an over-secured creditor. To the extent that the collateral exceeded the PCA's fully secured claim, it could have been used to provide for other creditor's claims.

6. The differences between this case and the *Goldberg* and *Lellock* cases further supports this conclusion. In *Goldberg,* the debtor conveyed all of his life insurance proceeds to his probate estate without condition or limitation. Here, the assignment of the proceeds to the PCA is limited to the extent that the proceeds are necessary to satisfy the PCA claim outstanding at the

time. Likewise, unlike *Lellock,* the life insurance proceeds here are not the only source of collateral available to satisfy the secured claimant's debt. The PCA also has a security interest in the debtors' land. In fact, the combined security interests in the land and the proceeds may have made PCA an over-secured creditor at the beginning of the case. In *Lellock* the secured creditor had only one source to look to for security of its claim. That source had to satisfy the entire amount of the claim. Also, in *Lellock* the SBA was not even included in the list of creditors. SBA then had no opportunity to protect or even assert its interest in the bankruptcy proceeding.

### C. *The Life Insurance Proceeds As Income*

 PCA also points out that FmHA builds its entitlement to receive a distribution of the life insurance proceeds on the argument that the proceeds are "disposable income" which under § 1225(b) must be distributed to creditors of the Chapter 12 bankruptcy estate. PCA contends that FmHA can not make this showing because by following a strict tax definition of income the life insurance proceeds are not even income which is subject to the disposable income analysis under § 1225(b). PCA believes under such an analysis FmHA is not entitled to receive any distribution of the proceeds and that Rita Martin was fully entitled to enter into an agreement with PCA to distribute the proceeds to PCA.

FmHA argues in response that the life insurance proceeds generate "disposable income." FmHA does not believe that § 1225(b) contemplates the use of a tax definition of income. FmHA asserts that the proceeds are disposable income which PCA should be made to disgorge and that the Court should order distributed to the claims of unsecured creditors. Both FmHA and PCA believe, however, that in resolving this issue, the Court should determine only whether the proceeds can be characterized as income for the purposes of § 1225(b). If the Court determines that the proceeds are income, then the parties believe an additional hearing to determine what portion of the proceeds are disposable income will be necessary.

At the center of this issue is the construction of the language of § 1225(b) which provides, in relevant part:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> > (B) the plan provides all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.
>
> (2) For purposes of this subsection, "disposable income" means income which is reasonably necessary to be expended—
>
> > (A) for the maintenance or support of the debtor or a dependent of the debtor; or
> >
> > (B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.

Subsection (b)(2) defines disposable income as "income which is received by the debtor" subject to certain specified reductions. Neither this provision, nor the definitional provisions found elsewhere in the Code, define the term "income".

PCA asserts that this Court should look to the Tax Code for assistance in defining income. PCA points out that the Tax Code specifically exempts life insurance proceeds from gross income pursuant to 26 U.S.C. § 101(a)(1). That section states:

> Gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

PCA concludes that by applying a tax definition the life insurance proceeds should not be considered income which is subject to the disposable income test and eventually subject to distribution to creditors. Through this conclusion PCA implies that FmHA has no interest in the funds and, therefore, can not prevail on a motion seeking disgorgement and distribution of the funds.

PCA further supports its argument for applying a Tax Code definition of income by pointing out that a number of courts have adopted this standard when dealing with questions of income eligibility requirements for Chapter 12. *See, e.g., In re Fogle,* 87 B.R. 493, 496 (Bankr.N.D.Ohio 1988); *In re Faber,* 78 B.R. 934, 935 (Bankr.S.D.Iowa 1987); *In re Shepherd,* 75 B.R. 501, 504 (Bankr.N.D.Ohio 1987). PCA contends that it would be incongruous to apply differing standards for eligibility and for disposable income computations. Fur-

ther PCA contends that all disposable income determinations made under the nearly identical § 1325(b) disposable income requirement comport with the strict tax approach.

FmHA responds to PCA's arguments by contending that § 1225(b) never contemplates a tax definition for income when determining disposable income. FmHA points out that a strict tax definitional approach for "income" under § 1225(b) would lead to anomalous results. FmHA asserts that under PCA's reasoning a number of "tax exempt" items like social security payments, interest on state or municipal bonds, inheritances, gifts, etc., would also be excluded from the disposable income calculation. While short on authority to back its assertions, FmHA argues that those items all should be included as income in the disposable income determination.

This Court recognizes the relative dearth of authority addressing this question. However, the little authority available appears to provide more support for the FmHA position. For example, the Tax Code specifically provides that "[g]ross income does not include the value of property acquired by gift, bequest, devise, or inheritance." 26 U.S.C. § 102(a) (1988). The Bankruptcy Court for the District of New Hampshire has ruled, however, that the debtor's post-confirmation receipt of an inheritance worth approximately $300,000, warranted a modification of the debtor's confirmed Chapter 13 plan so that unsecured claimants would be paid in full. *In re Euerle*, 70 B.R. 72, 73 (Bankr. D.N.H.1987). While the *Euerle* decision did not discuss specifically whether the inheritance is income under § 1325(b), the result and implication of the decision are that the funds constitute "disposable income" under Chapter 13 of the Bankruptcy Code regardless of how they are treated in the Tax Code. If the *Euerle* court followed the PCA's strict tax definition approach, then the inheritance could have been exempted from distribution to unsecured creditors.

Likewise, the Tax Code provides that only a portion of social security benefits a person receives each year can be considered as gross income. 26 U.S.C. § 86 (1988). However, one court has observed in a footnote while discussing plan feasibility:

> Significantly, the Debtors have not incorporated their current $350.00 per month social security income in projecting future income for plan purposes, although it is and must be included for § 1225(b)(2) "disposable income" purposes.

*In re Kloberdanz*, 83 B.R. 767, 772 n. 19 (Bankr.D.Colo.1988). While Judge Brooks did not specifically reject a tax analysis for disposable income, he also made no reduction pursuant to the guidelines provided in 26 U.S.C. § 86 in the amount of the social security income which could be included in "disposable income." Such a reduction would be required if the *Kloberdanz* court had employed a strict tax definition of income.

Similarly, under a tax analysis "gross income does not include ... the amount of any damages received (whether by suit or agreement and as lump sums or as periodic payments) on account of personal injuries or sickness." 26 U.S.C. § 104(a)(2) (1988). In *In re Tomasso*, 98 B.R. 513 (Bankr. S.D.Cal.1989), the court was faced with the question of whether funds obtained in a post-petition settlement of a personal injury lawsuit should be considered as disposable income under § 1325(b). While the *Tomasso* court found that the majority of the funds qualified as exempt property, the court specifically noted that "any nonexemptible portion would constitute part of the debtor's § 1325(b) 'projected disposable income.'" 98 B.R. at 516.[7] If the court had employed a strict tax definition of income for the purposes of determining disposable income, then none of the funds would have been subject to distribution under the plan.

---

7. The court, however, went on to find that since the debtor already voluntarily had paid an amount exceeding the exemptible portion of the funds into the plan, the debtor would not need to pay any additional sum into the plan.

A Chapter 12 case discussing the disposable income issue is *In re Wood*, 122 B.R. 107 (Bankr.D.Idaho, 1990). That case did not deal directly with the issue of whether non-taxable income is included in the disposable income calculation, but the court did hold that tax returns are not a reliable method of determining the debtor's disposable income. Tax returns often contain noncash transactions for both income and expenses. The *Wood* court found that the debtors actual performance based on a cash method accounting is a more reliable method of determining disposable income. 122 B.R. at 117.

While none of the cases cited in the above text definitively reject a strict tax definition of income for the purposes of the disposable income test, they do indicate that the disposable income test is not "premised on a Tax Code approach" as PCA argues.[8] This Court reaches the same conclusion and finds that income under the disposable income test in § 1225(b) is not determined by a Tax Code approach.

PCA's argument that the cases which look to the Income Tax Code for purposes of determining whether a particular item of income should be counted for purposes of determining Chapter 12 eligibility also must be rejected. The leading case which adopts the PCA's position on eligibility is the case of *In re Armstrong*, 812 F.2d 1024 (7th Cir.1987). However, the *Armstrong* approach has been rejected by the Eighth Circuit in the case of *In re Easton*, 883 F.2d 630, 633 (8th Cir.1989). Consequently, the strict income tax definition approach to Chapter 12 eligibility is not even the law of this circuit.

It is the conclusion of this Court that items of income, whether taxable or non-taxable, that are received by the debtor during the administration of a Chapter 12 case and become property of the estate are income for purposes of the disposable income test of § 1225(b). The purpose of Chapter 12 is to give debtors a fighting chance to save the family farm while paying to all creditors, particularly unsecured creditors, at least as much as they would receive in a Chapter 7 liquidation. One of the requirements, however, is that if the debtors receive unusually large income during the administration of the Chapter 12 case, that income must be dedicated to payment of unsecured creditors through the disposable income requirement of § 1225(b). This is true whether the income is taxable or whether the income is a nontaxable event such as receipt of insurance, bequest, personal injury settlement, or some other such nontaxable event.

This is not to say that all of the life insurance is subject to payment to unsecured creditors. This Court still must determine which portion of the life insurance income is "disposable" for purposes of § 1225(b). It may very well be that the event which triggered the payment of the life insurance, that is, the untimely death of Mr. Martin, may result in circumstances which make retention of all or a significant portion of the life insurance by Mrs. Martin necessary for the continued viability of their family farm operation. However, those are all evidentiary matters which must be decided in a separate proceeding.

### Conclusion

PCA has moved for summary judgment on the FmHA's motion to disgorge life insurance proceeds paid to the PCA. Based upon the stipulated facts, the Court has concluded as follows:

---

8. In support of such an argument, PCA also has asserted that items which do not qualify as income under the tax laws do not qualify as income under the disposable income test. The only case which PCA cites to support that contention is *In re Schyma*, 68 B.R. 52 (Bankr. D.Minn.1985). PCA believes this case can be read to the effect that gratuitous payments the debtor received, exempt under the tax definition of income, were therefore exempted from income for the purposes of disposable income. The court stated, however, that "*sporadic* gratuitous assistance ... is not, of itself, regular or disposable income for Chapter 13 purposes." 68 B.R. at 63 (emphasis added). In reaching that conclusion the *Schyma* court relied on *In re Campbell*, 38 B.R. 193, 196 (Bankr. E.D.N.Y.1984), which found that gratuitous payments were not sufficient to be "regular income" for the purposes of qualification for Chapter 13 relief. This Court believes that the *Schyma* case too was more concerned with the regularity of the payments than whether they were "gross income" under the Tax Code.

1. PCA is limited to an allowed secured claim of $388,079.

2. The life insurance proceeds from the Illinois Mutual Life Insurance policy are property of the estate.

3. Mrs. Martin takes the life insurance proceeds free and clear of any lien rights of the PCA.

4. The life insurance proceeds represent income for purposes of computation of the disposable net income available for payment to creditors under § 1225(b).

## ORDER

IT IS THEREFORE ORDERED that the motion of the PCA for summary judgment is denied.

IT IS FURTHER ORDERED that based upon the conclusions reached in this opinion, the relief sought by the FmHA should be granted. The PCA is ordered to disgorge the life insurance proceeds received from the debtor, Rita Martin. The life insurance proceeds shall be placed in an interest bearing account in a U.S. Trustee approved depository under the joint control of the Chapter 12 trustee and the debtor, Rita Martin. The money shall remain in that account until this Court enters an appropriate order providing for further disposition of the funds.

DONE AND ORDERED.