**In re Dean E. GAGE, Social Security No. 544–34–7953, and Jeanine A. Gage, Social Security No. 504–36–0500, Debtors.**

**Bankruptcy No. 87–40634.**

United States Bankruptcy Court, D. South Dakota, S.D.

Oct. 1, 1993.

---

**7.** There is nothing in the record indicating that any of the creditors support the dismissal motions.

Wanda Howey–Fox, Harmelink & Fox Office, Yankton, SD, for debtors.

John C. Quaintance, Quaintance, Johnson & Starnes, Sioux Falls, SD, for Farm Credit Bank of Omaha.

Larry Dean Nelson, Sioux Falls, SD, for Rick A. Yarnall, Chapter 12 Trustee.

### MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

The matter before the Court is an objection to Debtors' Chapter 12 discharge filed by Sioux Falls Attorney John C. Quaintance on behalf of Farm Credit Bank of Omaha [hereinafter "FCBO"], responded to by Sioux Falls Attorney Larry Dean Nelson on behalf of the Chapter 12 Trustee, and resisted by Debtors' counsel, Yankton, South Dakota, Attorney Wanda Howey–Fox. The objection is based upon the allegation that net disposable income exists for distribution to the unsecured and undersecured creditors of this bankruptcy reorganization. After an evidentiary hearing, the Court took the matter under advisement. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Federal Rule of Bankruptcy Procedure 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).

### PROCEDURAL BACKGROUND AND HISTORY

Debtors filed a voluntary Chapter 12 petition for relief October 28, 1987, and filed a Plan of Reorganization January 27, 1988. Pursuant to 11 U.S.C. § 1225(b)(1), Debtors made a commitment to apply all disposable income received during the life of the plan toward payments under the plan, and the

Court ordered confirmation March 16, 1988. Immediately thereafter, FCBO and Debtors sought and obtained court approval of a stipulation and agreement concerning various matters, including the amount and plan treatment of FCBO's allowed claims, which resulted in an amended order of confirmation entered April 22, 1988. On March 27, 1992, Debtors filed a Final Report and Final Account indicating all plan requirements were complete and asserting proper posture for Chapter 12 discharge. This action provoked FCBO to file an Objection to Entry of Chapter 12 Discharge on April 24, 1992, and a Supplement to Objection to Entry of Chapter 12 Discharge [hereinafter "Supplement Objection"] on November 3, 1992. The Supplement Objection identified several specific areas as potential targets of disposable income, areas which provide focus for the issue at hand.

The Supplement Objection states several reporting inaccuracies distort Debtors' actual financial situation. For example, loan repayments are calculated as an expense, but loan proceeds are not included as income received. And a lease transaction involving Debtors as both lessor and lessee should have been reported as a "wash," but only the deduction for farmland cash rent was reported without the corresponding sum listed as a receivable. The Supplement Objection also questions a $5,150 capital contribution, or loan, Debtors made to B & G Partnership, a hog feeding operation providing Debtors with either an equity position or a receivable in the same amount. A profit realized from the sale of a 1983 automobile is not shown as income, nor is the $2,400 balance due Debtors from

an installment sale contract for tillage machinery. Finally, the Supplement Objection cites living expenses as too high when compared to plan projections: for example, in 1989, Debtors expended $37,365 on household living expenses compared to the plan's estimated annual living expenses of $21,-000.[1]

On November 9, 1992, the Chapter 12 Trustee filed a Response to FCBO's Supplement to Objection to Entry of Chapter 12 Discharge objecting to the Supplement Objection for failing to state a claim on which to grant relief and for intimating that FCBO's opinion relative to amounts of disposable income was the same as the Trustee's. The response suggested the parties pursue their own separate issues and that Debtors bear the initial burden of proof regarding the turnover of disposable income.

After Debtors filed a Notice of Pre–Discharge Meeting and Hearing on Objections to Discharge, the Court agreed to continue the discharge hearing pending settlement negotiations. Those efforts were unsuccessful, and the matter was set for trial. Following a pre-trial conference, Debtors posed interrogatories to FCBO and the Chapter 12 Trustee requesting specific input relative to the perceived amount of net disposable income and the amount of expenses considered "reasonably" necessary for the continuation, preservation, and operation of the farming operation and for the maintenance or support of Debtors and their dependents.[2] Both FCBO and the Chapter 12 Trustee filed answers to the interrogatories.[3] An evidentiary hearing

---

1. The plan projected $18,000 for actual annual living expenses with an additional $3,000 needed for life insurance.

2. Debtors posed six interrogatories:

 1. How much disposable income is believed to be available for distribution?
 2. How was this sum calculated?
 3. Are any expenditures questioned for "reasonableness"?
 4. If yes, which expenses?
 5. How much is "reasonably" needed to continue, preserve, and operate the business?
 6. How much is "reasonably" needed for Debtors' support and maintenance?

3. The Trustee's answer indicated $27,660 or more was disposable income:

| | |
|---|---|
| • Capital Expenditures | $3,768.00 |
| • Sale of Assets to Son-in-law | 7,200.00 |
| • Sale of Ultra-light Airplane | 3,250.00 |
| • Sale of 1983 Buick Automobile | 300.00 |
| • Rent Received as Lessee | 5,360.00 |
| • Contribution to Hog Feeding Partnership | 5,150.00 |
| • Sale of 1991 Oldsmobile | 2,303.00 |
| • Federal Gas Refund Tax | 329.00 |
| • Profit on CCC-pledged Grain | Unknown |
| • Living Expenses Used for College Expenses | Unknown |

was held, the Court took the matter under advisement, and, as requested by counsel, a scheduling order was issued for the purpose of submitting written closing arguments.

## COMPETING ARGUMENTS

In this case, the disposable income dispute requires the Court to scrutinize five specific items or areas: 1) the amount of living expenses; 2) the profit realized from the sale of an automobile and an ultra-light airplane;[4] 3) the amount received under an installment sales contract;[5] 4) farm equipment expenditures;[6] and 5) an investment made to a hog feeding partnership.[7] The various positions, as presented at trial and in written closing arguments, provide a composite view of the issue at hand.

### FCBO's Position

Pursuant to the plan, a "business deal" was struck wherein Debtors were to provide FCBO guaranteed payments and a dividend from net disposable income should the "business" do well. FCBO believes the business has done well, characterizing the reorganization as a success story. Part of the success is found by analyzing the substantial volume of documentary evidence received at trial.[8] Attached to FCBO's written closing argument is its analysis of the evidence and calculation of disposable income, covering the time from January 1, 1988, through October, 1991, the last

---

Except for the capital expenditures, the Trustee did not question amounts listed as necessary to continue and preserve the farming operation.

FCBO indicated that "disposable income" was available, but due to insufficient data from Debtors and due to problems reconciling various types of financial reports, the amount was not able to be calculated. FCBO questioned living expenses and the reporting "distortions" as set forth in the Supplement Objection. The answer further stated that no amount of disposable income was needed to continue and preserve the farming operation or to support Debtors and their dependents, inasmuch as Debtors have the ability to "regularly cash flow and/or borrow amounts sufficient for such purposes."

4. Debtors do not dispute that the sale of a 1983 Buick automobile realized a $300 profit and the sale of an ultra-light airplane realized a profit of $3,250.

5. According to the Statement of Executory Contracts: "Debtors are selling under contract to son-in-law Kevin Scott, a Roto-mizer weed sprayer adn [sic] a Lely–Roterra tillage tool for $7,200.00. Balance owing $2,400 plus interest. Written, filed U.C.C. agreement—annual payments."

6. Page 6 of the Final Exit Report, paragraph XIII, "Capital Expenditures," describes farm equipment acquisitions:

- Tractor purchased for $1,350 in May, 1988.
- Gradder [sic] Fork purchased for $275 in November, 1988.
- Two Wagons purchased for $225 in March, 1989.
- Roterra purchased for $1,030 in May, 1989.
- Hay Baler purchased for $363 in March, 1989.
- Grain Auger purchased for $525 in June, 1991.

7. In 1991, Debtors contributed $5,150 to a pig feed partnership known as "B & G Partnership." The following contributions were made:
- $2,000 on January 17, 1991.
- $1,750 on June 3, 1991.
- $1,400 on November 26, 1991.
Exhibit T–8.

8. The following documentary evidence was received at trial:
- Debtors' 1988 Federal Income Tax Return—Exhibit D–1.
- Debtors' 1989 Federal Income Tax Return—Exhibit D–2.
- Debtors' 1990 Federal Income Tax Return—Exhibit D–3.
- Debtors' Final Exit Report (Amended)—Exhibit D–4.
- Debtors' Amended 1989 Annual Report—Exhibit D–5.
- Photocopies of PIK Certificates—Exhibit D–6.
- Analysis of Personal Living Expenses—Exhibit D–7.
- Eighth Farm Credit District's Balance Sheet—Exhibit F–1.
- October, 1991, Chapter 12 Monthly Report—Exhibit F–2.
- Debtors' Chapter 12 Reorganization Plan—Exhibit T–1.
- Order Confirming Chapter 12 Plan—Exhibit T–2.
- Amended Order Confirming Chapter 12 Plan—Exhibit T–3.
- 1988 Annual Report of Operations—Exhibit T–4.
- 1989 Annual Report—Exhibit T–5.
- 1990 Annual Report—Exhibit T–6.
- Debtors' Final Report and Final Account—Exhibit T–7.
- Photocopies of checks contributed to B & G Partnership—Exhibit T–8.
- Debtors' 1991 Federal Income Tax Return—Exhibit T–9.

month Debtors filed a Monthly Report with the Chapter 12 Trustee. Using Debtors' Final Exit Report, FCBO calculates income for the plan period as $694,240 and expenses as $617,322.[9] The difference, $76,918, is declared "net income." FCBO adds $63,494 to "net income" to represent the total sum of "adjustments" for three specific items: excessive living expenses, the installment sales contract, and the investment made to the hog feeding operation.[10] The sum of this calculation—"net income" of $76,918 plus "adjustments" of $63,494— is $140,412. Finally, FCBO subtracts $61,732, the amount of unpaid loans owed as of the date of the Final Exit Report, for a new total of $78,680, which, FCBO believes, is the amount of disposable income available for distribution.

Once the objecting parties made a sufficient preliminary showing for the existence of disposable income, the burden of proof shifted to Debtors. FCBO maintains Debtors did not sustain their burden of proving why actual living expenses exceeded plan projections so drastically or, stated differently, why nobody should care that Debtors "let their belts out notch after notch after notch to make room for nearly enough disposable income to pay their undersecured and unsecured claims twice over." As FCBO recalls, Debtors testified that the whole situation was simply a matter of having more money and spending it.

Testimony is only one aspect available for consideration, and FCBO urges the Court to consider the total circumstances involved in this case, including the fact that, during the plan, Debtors borrowed money and repaid substantially all of it; Debtors demonstrated a skillful ability to handle money, as shown by a series of automobile purchases, an investment in a hog partnership, and the "remarkable sale" of an ultra-light airplane for roughly 400% of its scheduled value; and the fact that Debtors' own financial data shows there is more than enough disposable income to require full payment of the undersecured and unsecured claims, plus Trustee fees, too.

FCBO contends Debtors had enough money to make their undersecured and unsecured creditors whole, "but they spent it for reasons they now can't or won't explain, and they can borrow it, too." Therefore, it is only equitable that the unsecured and undersecured creditors be allowed to share in the success of this reorganization through the distribution of disposable income.

*Chapter 12 Trustee's Position*

Attached to Debtors' confirmed plan is a liquidation analysis, which, the Chapter 12 Trustee argues, contains a valuation problem with respect to the category entitled "Miscellaneous Personal Possessions." Debtors assigned to this entire category, described as "Cash on hand, deposits, rifle,

9. Using data supplied by Debtors' Final Exit Report, FCBO calculates Debtors' income and expenses as follows:

**INCOME**

| | |
|---|---|
| Livestock Sales | $ 0 |
| Crop Sales | 280,512.00 |
| Government Payments | 23,769.00 |
| W–2 Income | 32,633.00 |
| Rent Income | 53,261.00 |
| Miscellaneous | 75,361.00 |
| Other Accrued Income | 6,395.00 |
| Crop Inventory at Discharge | 70,940.00 |
| Cash on Hand, Final Monthly Report | 9,507.00 |
| New Borrowing—Loans | 141,862.00 |
| TOTAL | $$694,240.00 |

**EXPENSES**

| | |
|---|---|
| Household & Living | $ 136,444.00 |
| Operating | 281,016.00 |
| Payments Through Trustee | 53,704.00 |
| Payments Direct to Creditors | 60,928.00 |
| Cash Collateral, Loan Principal Repayments | 80,130.00 |
| Property Tax Due | 5,100.00 |
| TOTAL | $ 617,322.00 |

10. FCBO used the following formula and rationale to adjust "net income" by $63,494:

• $55,944 was added for excessive living expenses. The plan projected annual expenses at $21,000. This amount, times the 3.8 years covered by the plan, is $80,500. FCBO subtracted $80,500 from Debtors' reported expenses of $136,444 to arrive at the adjusted figure of $55,944.

• $2,400 was added to represent the unpaid installment contract owed to Debtors by their son-in-law as of the date of confirmation.

• $5,150 was added to represent the total amount of contributions Debtors made to the hog feeding partnership.

tools, and ultra-lite airplane," a total market value of $885. The problem is that Debtors sold the ultra-light airplane for $3,250. In addition, the liquidation analysis fails to disclose Debtors' interest in the installment sales contract wherein Debtors received a final payment post-confirmation. The Chapter 12 Trustee contends disposable income should protect undersecured and unsecured creditors in instances where debtors have profited on gains of assets which were undervalued on the liquidation analysis. To support this argument, the Chapter 12 Trustee cites *In re Sirek Farms*, Ch. 12 Case No. 87–40077 (Hearing, D.S.D. June 7, 1991, Hoyt, J.; Order Discharging Chapter 12 Debtor, D.S.D. Dec. 5, 1991, Ecker, J.), where a hardship discharge was denied absent repayment equal to the value of a "coop stock," because the debtor failed to disclose the asset to counsel. In this instance, the Chapter 12 Trustee believes Debtors should pay the value of the executory contract which was unpaid and owing to Debtors as of the date of confirmation, in addition to paying the profit realized from the sale of the ultra-light airplane, calculated as the amount over and above the amount of value provided in the liquidation analysis.

Relying strictly on Debtors' plan provisions or, rather, the lack thereof, the Chapter 12 Trustee objects to farm equipment purchases totaling $3,768, since no plan provision was made for capital expenditures and since Debtors gave no notice prior to the expenditures. Likewise, the plan did not contemplate the sale and/or purchase of various automobiles; nevertheless, Debtors sold a 1983 Buick diesel automobile and realized a profit. The Chapter 12 Trustee believes these items should be considered disposable income.

According to the Chapter 12 Trustee, on average, living expenses increase between two and seven percent. However, in this case, Debtors expended $23,491 for family living during the first year of the plan, $37,365 during the second year, and $31,-667 during the final year. The Trustee observes Debtors maintained an enhanced living standard "not enjoyed by the majority of the Debtors that this Chapter 12 Trustee administers" and asserts Debtors offered no convincing testimony or evidence to explain why there was a need for expenditures substantially greater than those in the initial plan year. Therefore, the Court should order Debtors to pay over an amount that fairly and equitably would not reward this enhancement.

Finally, the Trustee characterizes the $2,000 Debtors borrowed to invest in a hog feeding partnership as disposable income.[11] Debtors claimed this investment was necessary to maintain certain "out buildings" due to an expired lease, but the Chapter 12 Trustee argues Debtors never showed what attempts, if any, were made to lease out the property to others in order to avoid this "expense." The Trustee believes a benefit from the investment is "disguised in the return of equity and profit in the form of 'capital gains' distributions to the partners on the cessation and/or winding up of the partnership."

*Debtors' Position*

Debtors steadfastly maintain no net disposable income exists as defined and contemplated by 11 U.S.C. § 1225(b)(2). A review of the tax returns, Annual Reports, and Final Report and Final Account supports this position. Debtors acknowledge the receipt of wages and income throughout the plan period, but these sums were offset by high operating losses which resulted in an overall loss sustained during the reorganization.

As an aside, Debtors state complete financial information was always provided to the Trustee and readily accessible to all creditors and/or interested parties, yet the one creditor objecting to discharge, FCBO, made no objection during the life of the plan to what is now perceived as "extravagant" family living expenses. As an argument, Debtors refute the allegation by explaining the projected cash flow was simply

---

11. At trial, the Chapter 12 Trustee introduced evidence that Debtors contributed $5,150 to the hog feeding operation, but in written closing argument, the Chapter 12 Trustee only identified and discussed the initial $2,000 investment.

a best guess and that no evidence established that Debtors did, in fact, live extravagantly. Rather, to substantiate Debtors' own testimony, their accountant testified that, based on her twenty years of experience, Debtors did not live "high on the hog."

Debtors believe the objections intimate that because Debtors borrowed money during the plan period, they should now be required to pay net disposable income and borrow funds necessary to fund their future operations. In response, Debtors state neither the statutory language nor its legislative history requires a Chapter 12 debtor to borrow money to continue the farming operation either during the pendency of the plan or following discharge. On the contrary, the primary object of Chapter 12 is the furtherance of the debtor's business, and in order to continue, preserve, and operate that business, the Chapter 12 debtor must pay expenses using some income from one year to the next or else the plan will fail. Moreover, the Bankruptcy Code, in using the term "continuation," contemplates the use of "excess income" to keep the business going. Therefore, Debtors believe they "should be able to keep and use that part of net operating income above what is reasonably necessary to pay the upcoming year's expenses without obtaining credit." In short, Congress never envisioned debtors having to borrow money from one plan year to the next in order to retain excess income for the purpose of paying disposable income.

As to the capital expenditures of $3,768, Debtors testified that the farm equipment was "necessary to effectively manage their operation or to increase their profitability," and, at trial, no testimony refuted this position. Debtors testified that the items were not high ticket items but, rather, were of nominal value, necessary for the continuation and preservation of the farming operation.

As to the contract and sale of the ultra-light airplane, Debtors state there was no inadvertent omission of these items since they were listed as assets on the schedules, thereby negating the Trustee's reliance on

*In re Sirek Farms.* As to the "undervaluation" problem, Debtors believe that the original values were made in good faith and, absent any testimony to the contrary, no penalty should come Debtors' way for holding on to assets a number of years prior to having them sold.

In sum, Debtors believe the areas and/or items subject to scrutiny could have and should have been reviewed and/or objected to before discharge proceedings were commenced. And even though Debtors did obtain some credit during their plan years, the Code does not require a debtor to borrow funds from one year to the next simply for the purpose of preserving "excess income" as disposable income. Any conclusion to the contrary simply negates the "fresh start" policy of the Bankruptcy Code and is tantamount to extortion. Debtors request the Court to overrule the objections and to enter an order granting discharge and finding no net disposable income due.

## AUTHORITY

### *The Issue in Proper Context*

The issue is whether Debtors used all disposable income received during the plan period for payments under their confirmed Chapter 12 plan. The issue should be contemplated in its proper context—how the disposable income requirement fits with the overall scheme of Chapter 12 rehabilitation. Simply put, Chapter 12 was designed to give family farmers a fighting chance to save the farm and reorganize their debts while, at the same time, protecting creditors receiving payments under the plan through required provisions governing plan confirmation. *In re Martin,* 130 B.R. 951, 966 (Bankr.N.D.Iowa 1991); *In re Bowlby,* 113 B.R. 983, 989 (Bankr.S.D.Ill.1990). If the trustee or an unsecured creditor has objected to confirmation, the plan cannot be confirmed unless the court finds that either the plan provides for full payment of the allowed amount of each unsecured claim or the plan provides that the debtor must contribute all of the net disposable income received dur-

ing the plan period toward payments under the plan. *In re Fleshman*, 123 B.R. 842, 844 (Bankr.W.D.Mo.1990). Congress made it clear that if other confirmation requirements were satisfied, a debtor's payment of all disposable income during the plan period would be sufficient protection for unsecured creditors. *In re Bowlby*, 113 B.R. at 988. The disposable income requirement does not require that there be a specific sum for unsecured claims; rather, the debtor's plan must commit disposable income to plan payments for the period of the plan, based on projections made at the time of confirmation. *Matter of Schwarz*, 85 B.R. 829, 832 (Bankr.S.D.Iowa 1988). "Even though the projections may be uncertain, the commitment is not. The commitment is the real protection intended by Congress," and protection is the main purpose of Section 1225(b). *In re Rowley*, 143 B.R. 547, 553–54 (Bankr.D.S.D.1992).

Unequivocally, Chapter 12 was intended to ensure that reorganizations could succeed, but not at the total expense of creditors. A confirmed plan confers benefits and imposes burdens on the debtor while providing a fair level of protection and compensation to the creditors. The benefits include retaining ownership, possession, and operation of the farm (despite the existence of loan defaults and foreclosure remedies available to creditors) while striving to achieve the final goal of discharging indebtedness when plan payments are complete. *In re Fleshman*, 123 B.R. at 846. The burdens include paying creditors according to the requirements of Chapter 12, which may mean having to honor the commitment to use all disposable income received during the plan period for payments under the plan. Given the opportunity to succeed under Chapter 12, debtors should be motivated to ensure that, while enjoying the benefits of Chapter 12 reorganization, the burdens are also being met.

*The Guidelines for Determining Disposable Income*

■ Section 1225(b)(1) provides a minimum payment to unsecured creditors which is above the bare requirement that they receive at least as much under a proposed plan as they would upon liquidation, and as defined by Section 1225(b)(2), disposable income is "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor; or for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business." 11 U.S.C. § 1225(b)(2); *In re Bowlby*, 113 B.R. at 988. Because the minimum payment is based on plan projections, the definition "is intended to provide guidance in fixing the level of payments at the outset of the plan," but the actual determination of disposable income is not made until "after the fact." *In re Fleshman*, 123 B.R. at 844; *In re Wood*, 122 B.R. 107, 113 (Bankr.D.Idaho 1990). And because courts have agreed that a debtor should not be unreasonably hindered from reaching the goals of reorganization, nor accumulate an unreasonably large reserve of funds that would provide a windfall at the time of discharge, nor completely evade the payment of disposable income by improper expenditures, an "after the fact" determination is more than a simple cash flow inquiry. *In re Fleshman*, 123 B.R. at 845. *In re Rowley*, 143 B.R. at 555; *In re Coffman*, 90 B.R. 878, 886 (Bankr.W.D.Tenn. 1988). The "formula" is a *residual* amount subjectively calculated based on a totality of circumstances. *Farm Credit Bank v. Hurd*, 105 B.R. 430, 432 (W.D.Tenn.1989), *citing In re Coffman*, 90 B.R. 878, 884 (Bankr.W.D.Tenn.1988); *In re Rott*, 94 B.R. 163, 167 (Bankr.D.N.D. 1988). The operative guide is reasonableness. *In re Rowley*, 143 B.R. at 555; *In re Rott*, 94 B.R. at 166; *In re Coffman*, 90 B.R. at 884.

■ The first component of the determination is an income calculation from which other components, "necessary" and "reasonably necessary" living and business expenses, are subtracted. Any leftover income is considered "disposable income." *In re Schmidt*,[12] 145 B.R. 983, 987 (Bankr.

**12.** In *Schmidt*, the court offers a four-question guide to determine disposable income, which it

D.S.D.1991); *In re Bowlby,* 113 B.R. at 988. The Bankruptcy Code does not define "income," but, for purposes of this issue, it is not necessarily calculated or premised on a strict Tax Code approach: "items of income whether taxable or nontaxable, that are received by the debtor during the administration of a Chapter 12 case and become property of the estate are income for purposes of the disposable income test of 1225(b)." *In re Martin,* 130 B.R. at 966. *In re Schmidt,* 145 B.R. at 986; *In re Wood,* 122 B.R. at 114. Loan proceeds received during the plan may also be included as income, inasmuch as they may have been used to pay "necessary" and "reasonably necessary" expenses which are eventually subtracted from income.

 Once income is calculated, expenses must be considered, and, like income, expenses are subjectively determined by the facts of each case. *In re Bowlby,* 113 B.R. at 989. Some appropriate factors include the amount of and reason for any variance in actual income and expenses as compared to plan projections, past borrowing practices, need for capital improvements, and the amount of and reason for any significant operating expansions. *In re Schmidt,* 145 B.R. at 987. Again, the guiding star is reasonableness. One of the controversies arising when scrutinizing expenses is whether or not it is reasonable to require a debtor to seek an operating loan in order to free up cash on hand for distribution as disposable income. No Code provision requires a debtor to borrow money for farm production either during or after the plan period, and yet securing operating loans is common practice in the farming industry. *In re Bowlby,* 113 B.R. at 989. There is no per se rule on the subject, only a balance to be struck. Courts should be concerned that reorganization goals are met but that the debtor does not emerge

with enough cash to completely finance the next year's crop expenses or end up with a windfall that would provide the debtor with an advantage over other farmers. *Id.* For example, if a plan is successful, a debtor may have retired substantial debt and be in a position to deserve and obtain credit, in which case, the Code would require that credit be accepted, remembering that the purpose of Chapter 12 is a fresh start, not a method to ensure future success. *In re Wood,* 122 B.R. at 116. The court should consider not only those amounts expended during the plan but also amounts required in the future. *In re Stottlemyre,* 146 B.R. 234, 236 (Bankr.W.D.Mo.1992); *In re Bowlby,* 113 B.R. at 988; *In re Coffman,* 90 B.R. at 884. While the "future funding" concept has sparked some debate, the logic is sound: the plain meaning of the statute contemplates the use of plan income to sustain the operation beyond a particular operating year and is in furtherance of the general purpose of Chapter 12: to keep farmers farming. *In re Wood,* 122 B.R. at 115; *In re Bowlby,* 113 B.R. at 988.

*The Burden of Proving Disposable Income*

 When disposable income is at issue, the Court believes the objecting party must make a prima facie case regarding the existence of disposable income, and, if established, the burden of going forward with the evidence shifts to the debtor to refute the inference. The ultimate, non-shifting "burden of persuasion," however, belongs with the objecting party. Accordingly, close calls will go against the objecting party. This position recognizes two separate and distinct parts of the term, "burden of proof." The party with the "burden of persuasion" must persuade the trier of fact on all elements of the case, a responsibility that does not shift to any

defined as "the difference between the debtor's available income and allowed expenses during the payment period":
 1. What is the disposable income payment period?
 2. What was debtor's available income?
 3. What were the debtor's necessary expenses?

 4. What amount, if any, may be retained as "reasonably necessary" for maintenance or support of the debtor and his family and for "the continuation, preservation, and operation of the debtor's business?"
*In re Schmidt,* 145 B.R. at 987.

other party, whereas the party with the "burden of going forward with the evidence" may shift the onus back to an opposing party if evidence is produced to enable the trier of fact to infer the existence of a fact to be proved. *In re Fries*, 68 B.R. 676, 683–84 (Bankr.E.D.Pa.1986), *citing McCormick on Evidence* §§ 336–37 (2d ed. 1972); IX *Wigmore on Evidence* §§ 3485–87 (rev. ed. 1981). Some courts believe that once the objecting creditor satisfies the initial burden of proving the existence of disposable income, the ultimate burden rests with the debtor to show all disposable income has been applied toward plan payments, a position based on the fact that the debtor, duty-bound to make all plan payments and demonstrate eligibility for discharge, has the detailed knowledge concerning income and expenses, is in the best position to have made projections for the year following discharge, and is the only one who can show that the possibility of using operating loans to produce next year's crop has been thoroughly explored. *In re Schmidt*, 145 B.R. at 990; *In re Wood*, 122 B.R. at 112; *In re Kuhlman*, 118 B.R. 731, 738 (Bankr.D.S.D.1990); *In re Bowlby*, 113 B.R. at 991. In contrast, this Court finds instructive the discussion in *"Chapter 12 in the Courts,"* where this allocation is considered "backward." Jonathan K. Van Patten, *Chapter 12 in the Courts*, 38 S.D.L.Rev. 52, 88 (1993). True, the debtor is in the best position to explain forecasts and projections, to identify all sources of income, and to justify expenditures as reasonably necessary, but this posture is a result of the necessary "gloss" on the statute which requires an analysis of actual rather than projected numbers to determine disposable income and, therefore, is more appropriately associated with

the burden of producing sufficient evidence as opposed to the burden of ultimate persuasion:

> Given the inherently subjective nature of the ultimate determination, the burden of persuasion should be on the objecting party once the debtor has made a prima facie case for payment of all disposable income. Making the debtor prove a prima facie case of plan compliance, including the disposable income commitment, is fair because the debtor has the financial information more readily available. Making the objecting party bear the burden of persuasion on the close calls is fair in light of the underlying purpose of Chapter 12 to promote the financial rehabilitation of family farmers.

*Id.* This also follows Bankruptcy Rule 4005 which states that the party objecting to a discharge has the burden of proving the objection.[13]

## ANALYSIS

The objections and arguments raised by FCBO and the Chapter 12 Trustee establish a prima facie case for the existence of disposable income. Debtors have the burden of going forward with evidence to refute the allegation that not all income received during the plan period was reasonably necessary to support the Debtors and their dependents or to continue, preserve, or operate their farm.

Debtors' accountant prepared federal income tax returns and helped prepare required Chapter 12 reports which were received as evidence to help show income received during the plan period. Based on 1988–1991 income tax returns, the accountant testified to an overall loss of farm income during the plan period.[14] This same

---

**13.** The Advisory Committee Note states that Bankruptcy Rule 4005 "leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector." [citations omitted]

**14.** Debtors reported an overall loss of farm income during the three-year plan period, howev-

er, the federal income tax returns indicated adjusted gross income as follows:

• 1988 Income—Wages and taxable interest totaled $9,321. However, a reported farm income loss of $4,577 reduced adjusted gross income to $4,744.

• 1989 Income—Wages, taxable interest, and rent totaled $27,712. However, a reported farm income loss of $13,241 reduced adjusted gross income to $5,150.

conclusion is not as clear from the Chapter 12 reports, because, as explained by the accountant, the requested information does not "prove to anything," cannot be reconciled with typical methods of accounting, and is formatted differently from one year to the next.[15] Despite these problems, the Amended Final Exit Report calculates income at $542,871.[16] In addition, loan proceeds totaling $141,862 [17] should also be calculated as income since they are reported on the Annual and Final Exit Reports and loan repayments are subtracted from total income.[18] Total income, then, is $684,733.[19] Before considering "reasonably necessary" expenses, income is first reduced by all "necessary" payments, including plan payments of $114,632 [20] and tax payments of $5,100. The difference, $565,001, is further reduced by loan repayments of $80,130 and outstanding loan indebtedness of $61,732 for net income of $423,139. This is the amount subject to expenses reasonably necessary "for the maintenance or support" of Debtors and their dependents and reasonably necessary "for the payment of expenditures necessary for the continuation, preservation, and operation" of their farming enterprise.

Of the five potential sources of disposable income, two related areas are profits realized from the sale of the ultra-light airplane and the 1983 Buick automobile, and payments received under the contract for sale of equipment. The objection states the undersecured and unsecured creditors should be protected where a debtor profits on gains of assets. For purposes of a disposable income analysis pursuant to the definition of Section 1225(b)(2), the objection logically ties to "income which is received by the debtor" during the plan. If properly integrated as income, any further scrutiny, for purposes of determining disposable income, is accomplished as part of the overall residual analysis of "income received less reasonably necessary expenditures," rather than characterizing the profits or payments themselves as specific sums of disposable income. Both witnesses at trial testified that once received, these sums were deposited in the farm account, used to pay expenses, and listed as income received on the 1988 Annual Report under the heading "Miscellaneous Receipts," specially notated as "Personal Items Sold."

■ The third potential source of disposable income is Debtors' acquisition of farm equipment, and the objection is that

---

• 1990 Income—Wages, taxable interest, and rent totaled $23,181. A reported farm income profit of $3,486 less one-half self employment tax of $247 resulted in an adjusted gross income of $26,420.

15. Although never identified by the parties, the Court had problems reconciling income data between the individual Annual Reports and the Amended Final Exit Report:
1. The 1988 Annual Report states "Farm" income was $124,422.79 and "Non–Farm" income was $10,841, for total income of $135,263.79. The Amended Final Exit Report tabulates 1988 income at $120,865.
2. The 1989 Annual Report states total income was $125,182. The Amended Final Exit Report tabulates 1989 receipts at $100,781.
3. The 1990 Annual Report states total income was $177,752. The Amended Final Exit Report tabulates 1990 income at $131,862.

16. The Amended Final Exit report calculates income as follows:
1. Receipts totaling $465,536:
• 1988 receipts—$120,865
• 1989 receipts—$100,781
• 1990 receipts—$131,862
• 1991 receipts—$112,028

2. Crop Inventory totaling $70,940
3. Accrued Income totaling $6,395
Total Plan Income $542,871.

17. Debtors borrowed a total sum of $141,862 during the plan period: $28,800 in 1989; $49,114 in 1990; and $63,948 in 1991.

18. The assessment is simply more accurate and complete if all resources received, including loan proceeds, are taken into account. It is then necessary to consider loan repayments and outstanding loan debt despite the ultimate "wash" that occurs.

19. FCBO would like to add the $9,507.22 cash on hand reported on Debtors' final Monthly Report filed for October, 1991. The Final Exit Report lists all income received during the plan, including the last ten months of 1991. The fact Debtors had leftover cash or income at the end of the plan does not constitute additional, unreported income.

20. Plan payments made through the Chapter 12 Trustee totaled $53,704, and plan payments made directly to creditors totaled $60,928.

no provision was made in the plan for capital expenditures. The question, then, is whether this means it was not reasonably necessary for Debtors to spend $3,768 for the payment of farm equipment needed to continue, preserve, and operate the farm. Obviously not. The testimony was that several relatively inexpensive pieces of equipment were bought throughout the life of the plan in order to operate the 522–acre farm. There was no evidence presented to rebut the testimony. Given the testimony, the nominal amounts expended,[21] the equipment acquired, and the time frame involved, the transactions were reasonably necessary as contemplated by the statute. Farmers expect the unexpected, and even though no plan was drafted to accommodate unexpected capital expenditures, they were reasonable.

■ The fourth suspect area is the 1991 investment or loan Debtors made to a hog feeding operation. Debtors sought to prevent the resulting loss of income when a lease for the use of certain "out buildings" expired, despite having to borrow the initial $2,000 investment. The investment yielded income of about $1,000, yet the Chapter 12 Trustee argues Debtors benefited further via a return of equity and profit in the form of capital gains distributions to the partners on the cessation and/or winding up of the partnership. In fact, Debtors did receive a non-taxable dividend from the partnership. The question is whether Debtors met their burden of refuting the objection by showing that $5,150 was reasonably needed to sustain, preserve, or continue the farming operation, which, in turn, would shift the onus back to the objectors. The answer is no. Debtors failed to provide sufficient basic factual information, including the following:

- When did the lease expire and how long had it been providing income?
- How much income was generated and was it relied on for any specific expenditures?
- Why was the lease not renewed and what efforts were made to obtain new lessees?

- Why was an investment chosen as the vehicle to replace rental income?
- How often was income received from the unexpired lease?
- How was it determined that the investment was certain to replace the lost income?
- How much time passed before the income was actually received?

The circumstances, as presented, do not indicate a $5,150 investment scheme was a reasonably necessary expense for operating the farm. Having failed to sustain the burden of proof, the total amount expended, $5,150, reduces Debtors' operating expenses to $275,866. All other operating expenses were uncontested.

■ The fifth and final area of scrutiny concerns the actual amount of living expenses incurred during the plan period as compared to the plan projections. Projected figures are intended to provide a degree of reliability as a tool to plan or set future goals. True, projections are best guesses, but, even so, they should be based on relatively known factors such as increases in cost of living, inflation, and anticipated changes within the family. Absent unusual or unforeseen circumstances, living expenses projected for a three-year period should be quite reliable, inasmuch as past expenses and current style of living provide significant assistance for assessing future needs. That is not to say actual figures cannot exceed projections—they may. That is to say, however, that projections are important in that they inherently create a point of reference which influences subjective reactions to actual data.

In this case, Debtors' best guess was that $21,000 would be reasonably necessary each year to maintain and support themselves and their two dependents. But as illustrated by Exhibit 7, an "Analysis of Personal Living Expenses," the projections held true for 1988 only—in 1989 and 1990, actual expenses soared dramatically:

---

**21.** The price range for each item was between $225 and $1,350. *See infra* n. 6.

| | 1988 | 1989 | 1990 | Jan.–Oct. 1991 |
|---|---|---|---|---|
| Food | $ 3,463 | $ 4,414 | $ 5,184 | $ 3,391 |
| Clothing | 1,414 | 2,383 | 3,330 | 1,880 |
| Household Expenses | 3,104 | 8,332 | 5,563 | 3,996 |
| Medical | 2,388 | 5,059 | 2,354 | 3,636 |
| School | ..... | ..... | ..... | ..... |
| Recreation & Personal Items | 3,349 | 5,222 | 4,790 | 3,276 |
| Charities | 1,718 | 2,344 | 2,328 | 2,152 |
| Personal Insurance | 2,517 | 3,748 | 3,640 | 4,362 |
| Transportation | 1,608 | 3,589 | 2,678 | 2,508 |
| Other | | | | |
| Real Estate Taxes | ..... | 1,186 | 1,686 | ..... |
| Income Taxes | 3,930 | ..... | ..... | 1,803 |
| Dryer | ..... | 318 | ..... | ..... |
| House Improvements | ..... | 466 | ..... | ..... |
| Church Camp | ..... | 304 | 114 | 189 |
| Visa/Bank Note | ..... | ..... | ..... | 4,447 |
| 1985 Jonathan | ..... | ..... | ..... | 4,900 |
| 1983 Buick | ..... | ..... | ..... | 2,800 |
| Toyota | ..... | ..... | ..... | 2,000 |
| Trustee Fee | ..... | ..... | ..... | 2,581 |
| TOTALS | $23,491 | $37,365 | $31,667 | $43,921 |

At trial, Debtors made some general, self-serving statements regarding the style of living maintained during the plan and that no vacations were taken or luxury items purchased, but as to the areas which increased the most, no explanation was made. No details were provided. No illustrations of expenditures were offered. No justifications or even defenses were attempted. Instead, Debtors testified that in 1988 and 1989 they had more cash and so they spent it. While candid and credible, this circumstance does not relieve the responsibility under Section 1225(b)(1)(B). Debtors must still apply all disposable income received during the plan toward payments under the plan.

It's easy to illustrate how subjective this issue really is by noting the different suggestions on how much is considered not reasonably necessary: FCBO contends anything above the projected $21,000 per year is not reasonably necessary, the Debtors simply state they have nothing left over and so every expense must have been reasonable, the Chapter 12 Trustee declines to offer a dollar amount but does state that, on average, living expenses increase between 2% and 7% each year, and Debtors' accountant believes $30,000 per year is reasonable for a family of four.

Forty-one percent of the actual living expenses incurred during this plan, or $56,-557, was spent in four areas clearly subject to Debtors' direct spending discretion: 1) Household Expenses; 2) Recreation & Personal Items; 3) Charities;[22] and 4) Transportation; whereas, Debtors spent $38,896 on the essential areas of clothing, food, and medical expenses. There was sufficient justification for the "Other" expenses, including a new clothes dryer and automobiles for work transportation, but obviously spending became rampant for these particular four areas. Absent special circum-

**22.** Like other aspects of disposable income, courts have generally held that the circumstances of each case should guide the issue of tithing and charitable contributions. *In re Fleshman,* 123 B.R. at 842; *In re Reynolds,* 83 B.R. 684 (Bankr.W.D.Mo.1988). But one court has indicated charitable contributions may not exceed 3% of gross income absent unusual circumstances. *In re Stottlemyre,* 146 B.R. at 237.

286

stances, and none were given, the Court finds the amounts spent in these areas were not reasonably necessary. The Court relies on the experienced Chapter 12 Trustee, whose statistics indicate that, on average, these types of expenses increase between 2% and 7% each year. And so if actual expenses were increased by 5% each year in each of these four areas, Debtors would have spent $16,297 less [23] and reduced reasonably necessary maintenance and support expenses to $120,147, instead of $136,444, which is still, on average, slightly more than $31,000 each year for living expenses.

One final note. In closing argument, Debtors discussed at length the contention that if any excess income existed from one year to the next during the plan period, and even after the discharge, Debtors should be allowed to use that sum for future expenses. The argument is purely academic as to funding the plan years, since the issue of disposable income was not raised until after the plan period. And as far as funding the farm operation following discharge, Debtors gave no evidence at all to indicate what expenses are anticipated post-discharge and what effect borrowing would have on the operation.

In summary, the Court's judicial determination of disposable income, based on the evidence presented, and based on the provisions of Section 1225(b), is as follows:

1. Income subject to Section 1225(b)(2) expenses: $423,139
2. Less reasonably necessary support expenses: 120,147
3. Less reasonably necessary operating expenses: 275,866
4. Equals disposable income: 27,126

**23.** If increased by 5% each year, the following totals would have been spent for these four areas:

| | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Household Expenses | $3,104 | $3,259 | $3,422 | $2,994 |
| Recreation | 3,349 | 3,516 | 3,692 | 3,230 |
| Charities | 1,718 | 1,804 | 1,894 | 1,658 |
| Transportation | 1,608 | 1,688 | 1,773 | 1,551 |

**CONCLUSION**

Chapter 12 was intentionally designed to allow the family farmer to succeed at financial reorganization, but not at the total expense of creditors. Alternative routes to plan confirmation were established, one of which permits confirmation despite creditor or trustee objection so long as the debtor commits all income toward payments under the plan which is received during the plan period and which is not reasonably necessary to maintain or support the debtor and his/her dependents and which is not reasonably necessary to pay expenses necessary to continue, preserve, and operate the farming business. This is a residual calculation that requires a subjective analysis of the facts of each case. The residual amount is disposable income.

Based on the facts and circumstances of this case, the Court finds $27,126 is disposable income. This is the sum that remains after finding that a $5,150 contribution or investment to a hog feeding operation was not a reasonably necessary expenditure for the continuation, preservation, and operation of the farm, plus finding that Debtors did not refute the allegation that all actual living expenses were reasonably needed to maintain and support their family of four. The Court used an average annual increase of 5% to reduce the amount of actual expenses in four categories of living expenses subject to Debtors' complete spending discretion: 1) Household Expenses; 2) Recreation & Personal Items; 3) Charities; and 4) Transportation.

In keeping with Debtors' commitment made at the time of plan confirmation, all disposable income received during the plan period must be used toward payments under the plan. When this commitment is honored, discharge will be granted.

The Court will enter an appropriate order.

## ORDER SUSTAINING OBJECTION
## TO CHAPTER 12 DISCHARGE

Pursuant to the Court's Memorandum Decision entered this date regarding objection to Debtors' Chapter 12 discharge which discusses the 11 U.S.C. § 1225(b)(1)(B) commitment Debtors made at confirmation to use all income received during the plan toward payments under the plan so long as it was not reasonably needed to maintain or support themselves and their dependents and not reasonably needed to pay expenses necessary to continue, preserve, and operate the farming business; and pursuant to the definition of disposable income provided by 11 U.S.C. § 1225(b)(2) as applied to the facts and circumstances of this case, it is hereby

ORDERED that the objection of Farm Credit Bank of Omaha is sustained, based on a determination that net disposable income does exist for distribution to the unsecured and undersecured creditors of this bankruptcy reorganization.